**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CHARLOTTE LOUISE TATE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL POMPEO, *Secretary of State, et al.*,<br><br>Defendants. | Civil Action No. 20–3249 (BAH)<br><br>Chief Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

Plaintiffs in this case are eighteen applicants for nonimmigrant O-1 and O-3 visas, which would allow them to enter the United States to further their professional careers in areas where they possess "extraordinary ability," or as family members of such individuals. The COVID-19 pandemic has disrupted the visa application and interview process, creating challenges both for foreign nationals wishing to travel to the United States and for the diplomatic posts responsible for processing visa applications. Plaintiffs have been unable to obtain visas, in part because the State Department has interpreted broadly certain Presidential Proclamations that forbid entry of individuals who were in certain designated countries within fourteen days of their attempted entry into the United States, as prohibiting the Department from issuing visas to individuals residing in those designated countries.

Plaintiffs have brought this suit to challenge the State Department's visa policy as unlawful and to compel resumption the adjudication of their visas. To this end, they have moved for a preliminary injunction to enjoin the State Department's visa-issuance suspension as contrary to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq*., and to compel the

State Department immediately to resume processing their visas on grounds of unreasonable delay.

The Court agrees with plaintiffs—and the decisions of two other Judges in this district—that the State Department has acted unlawfully in suspending O-visa processing based on the Presidential Proclamations, which pertain only to entry, but defendants prevail on the delay claim.  Plaintiffs' motion for a preliminary injunction is therefore granted in part and denied in part.

## I.      BACKGROUND

Provided below is an overview of the O-visa program through which plaintiffs seek to enter the country, and a description of the Presidential Proclamations and relevant State Department policies, followed by a summary of the procedural history of this action.

### A.      O Visa Program

The Immigration and Nationality Act ("INA") provides a nonimmigrant visa category for qualified individuals who "[have] extraordinary ability in the sciences, arts, education, business, or athletics . . . and [who] seek[] to enter the United States to continue work in the area of extraordinary ability."  8 U.S.C. § 1101(a)(15)(O)(i); *see also* 8 C.F.R. § 214.2(o).[1]  To obtain such an "O-1" visa, an individual outside the United States must (1) have an I-129 petition approved by the United States Citizenship & Immigration Services ("USCIS"), and then (2) apply for an O-1 visa at a United States embassy or consulate.  8 U.S.C. § 1184(c); 8 C.F.R. § 214.2(o)(1)(i).  O-3 visas allow for the spouses and minor children of O-1 visa recipients to obtain visas themselves.  8 C.F.R. § 214.2(o)(1)(i).

---

[1]      A nonimmigrant is admitted to the United States for a finite period, and for a specific purpose. 8 U.S.C. § 1184(a).

B.      **Presidential Proclamations**

In response to the COVID-19 pandemic, the President issued five Presidential

Proclamations, each containing similar provisions suspending the entry of certain immigrants

and nonimmigrants from specific countries experiencing significant COVID-19 outbreaks.  *See*

Proclamation No. 9984, 85 Fed. Reg. 6709 (Jan. 31, 2020) China); Proclamation No. 9992, 85

Fed. Reg. 12855 (Feb. 29, 2020) (Iran); Proclamation No. 9993, 85 Fed. Reg. 15045 (Mar. 11,

2020) (26 European countries in Schengen Area); Proclamation No. 9996, 85 Fed. Reg. 15341

(Mar. 14, 2020) (United Kingdom and Ireland); Proclamation No. 10041, 85 Fed. Reg. 31933

(May 24, 2020) (Brazil).

In each Proclamation, the President relied on 8 U.S.C. § 1182(f), which allows the

President to suspend and limit "entry" of certain aliens "[w]henever the President finds that the

entry of any aliens or of any class of aliens into the United States would be detrimental to the

interests of the United States."  The President specifically suspended the "entry . . . of all aliens

who were physically present within [any of the 31 countries] . . . during the 14-day period

preceding their entry or attempted entry into the United States."  *E.g.*, Proclamation No. 9984,

85 Fed. Reg. at 6710.  Each Proclamation contains exceptions to the general prohibition on entry,

including lawful permanent residents of the United States; aliens who are spouses, parents, or

children of U.S. citizens; various categories of specified visa holders; and aliens whose entry is

determined to be "in the national interest" by the Secretary of State.  *Id.* at 6710–11 (Section 2).

O-visa holders are not included in the exceptions and are therefore suspended from entry during

the relevant 14-day period.  The Secretary of State is charged with implementing each

proclamation "as it applies to visas pursuant to such procedures as the Secretary of State, in

consultation with the Secretary of Homeland Security, may establish."  *Id.* at 6711 (Section 3).

### C.      State Department, COVID-19, and Suspended Visa Processing

On March 20, 2020, the State Department directed all U.S. embassies and Consulates to "suspend all routine visa services due to the COVID-19 pandemic."  Am. Compl., Ex. A-1 ("March 20 DOS Guidance") ¶ 1, ECF No. 7-1; *see also* Defs.' Mem. in Opp'n to Pls.' Mot for Preliminary Injunction ("Defs.' Opp'n"), Ex. A, Decl. of Brianne Marwaha ("Marwaha Decl.") ¶ 2, ECF No. 11-1.  For the next few months, foreign posts offered only "mission critical or emergency services," which included certain categories of nonimmigrant visas and a discretionary category for "mission critical purposes of travel as determined on a case-by-case basis by post management," but did not include O visas.  Am. Compl., Ex. A-3 ("Apr. 28 DOS Guidance"), ECF No. 7-3; Marwaha Decl. ¶¶ 2–3.  On July 8, 2020, the State Department notified diplomatic and consular posts of a phased resumption of routine visa services starting on July 15, 2020, and issued instructions for reopening through a program called "Diplomacy Strong."  Am. Compl., Ex. A-3 ("July 8 DOS Guidance") ¶ 1, ECF No. 7-6.  That guidance indicated that in countries affected by the Presidential Proclamations, "[v]isa processing remains restricted to emergency or mission critical only," and exceptions to the Presidential Proclamations may also be used as a guide for additional mission-critical or emergency travelers."  *Id.* ¶ 10.  Routine appointments to process O visas would not resume until conditions improved and a post moved on to "Phase Two" of the reopening plan.  *Id.* ¶ 11.  Since services resumed, the State Department represents that its capacity to process visas has "significantly decreased" due to the pandemic.  Defs.' Opp'n, Ex. B, Decl. of Brenda L. Grewe ("Grewe Decl.") ¶¶ 3–4, ECF No. 11-2.  From July 15, 2020 through September 30, 2020, for example, only around 10 percent of the number of visa applications processed in previous years were adjudicated.  *Id.* ¶ 3.

Since visa processing resumed, the State Department has determined that certain classes of visa applicants would either automatically qualify or possibly qualify for a national interest exception under the Presidential Proclamations such that they would be permitted to enter the United States.  Pls.' Mot. for Preliminary Injunction ("Pls.' Mot") at 9, ECF No. 8; Defs.' Opp'n at 6.  On July 12, 2020, the State Department announced "that an alien subject to [Proclamations 9993 or 9996] traveling on a valid F-1 and M-1 nonimmigrant visa would automatically be considered for a national interest exception.  Defs.' Opp'n at 6 (citing Dep't of State, *National Interest Exceptions for Certain Travelers from the Schengen Area, United Kingdom, and Ireland* (updated Oct. 1, 2020), http://travel.state.gov/content/travel/en/News/visas-news/national-interest-exceptions-from-certain-travelers-from-the-schengen-area-uk-and-ireland.html) (last visited Jan. 15, 2021)).  The Department further announced that "business travelers, investors, academics, J-1 students, journalists and treaty traders" subject to Proclamations 9993 or 9996 "who are seeking a visa *may* qualify for a national interest exception" and noted that the "Department of State also continues to grant national interest exceptions for qualified travelers seeking to enter the United States for purposes related to humanitarian travel, public health response, and national security." *Id.* (emphasis in original) (quoting Dep't of State, *National Interest Exceptions for Certain Travelers from the Schengen Area, United Kingdom, and Ireland* (updated Oct. 1, 2020), http://travel.state.gov/content/travel/en/News/visas-news/national-interest-exceptions-from-certain-travelers-from-the-schengen-area-uk-and-ireland.html).

The State Department has refused, however, to issue O visas to individuals in Proclamation-designated countries who do not otherwise qualify for a national interest exception. The July 8, 2020 Guidance indicates that at "All Posts Impacted by a [Regional] Presidential Proclamation," "visa processing remains restricted to emergency or mission critical only."  July

8 DOS Guidance ¶ 10.  The State Department further indicated in a notice posted on its website that "[u]ntil complete resumption of routine visa services, applicants who appear to be subject to entry restrictions under . . . regional-focused Presidential Proclamations related to COVID-19 . . . might not be processed for a visa interview appointment unless the applicant also appears to be eligible for an exception under the applicable Proclamation(s)."  Dep't of State, *National Interest Exceptions to Presidential Proclamations (10014 & 10052) Suspending the Entry of Immigrants and Nonimmigrants Presenting a Risk to the United States Labor Market During the Economic Recovery Following the 2019 Novel Coronavirus Outbreak* (updated Aug. 12, 2020), http://travel.state.gov/content/travel/en/News/visas-news/exceptions-to-p-p-10014-10052-suspending-entry-of-immigrants-non-immigrants-presenting-risk-to-us-labor-market-during-economic-recovery.html (last visited Jan. 15, 2021); *see also* Marwaha Decl. ¶ 5.  The State Department has prioritized "visa services that are deemed an emergency, 'mission critical,' and/or are excepted from the Presidential Proclamations," Marwaha Decl. ¶ 10, and indicates that it will not issue O visas in Proclamation-designated countries, Defs.' Opp'n at 13–16.

Visa processing remains limited around the world due to COVID-19 restrictions, including limits on public gatherings, imposed by host governments, Marwaha Decl. ¶ 8, and limited post staffing because of COVID-19 illness and quarantine, *id.*  For example, the U.S. Embassy in London has only been engaging in "[l]imited visa processing" since December 7, 2020, and all diplomatic posts in China have yet to resume the phased resumption of visa processing.  *Id.*

### D.    Procedural History

Plaintiffs filed this suit on November 10, 2020, ECF No. 1, and then filed an amended complaint on December 4, 2020, ECF No. 7.  Plaintiffs contend that the State Department's reliance on the Presidential Proclamations to suspend visa processing in the relevant countries is

contrary to law and violates the APA for various reasons.  They also argue that the delayed processing of O visas constitutes unlawfully withheld and unreasonably delayed agency action.

Plaintiffs are fifteen O-1 visa applicants and three O-3 visa dependents whose applications are at various stages in the application process.  Am. Compl. ¶¶ 21–36.  All have approved I-129 petitions.  *Id.* ¶ 20.  Three have had their visa interviews and had their visas refused, under 8 U.S.C. § 1201(g), because they were subject to the Presidential Proclamations.  Defs.' Opp'n, Ex. C, Decl. of Courtney D. Paterson ("Paterson Decl.") ¶¶ 2–4, ECF No. 11-3; Defs.' Opp'n at 7 & n.2.  The rest are either waiting to schedule visa interviews or waiting to have cancelled interview appointments rescheduled.  *See* Am. Compl. ¶¶ 21, 23, 26–36; Defs.' Opp'n at 7.  All but one of the plaintiffs are subject to the Presidential Proclamations.  *See* Am. Compl. ¶¶ 21–35.  One plaintiff appears to reside in a country unaffected by the Proclamation, *see* Notice of Errata, Ex. 1 at 1 (Affidavit of Xiaojie Wang), ECF 13-1, and another has attempted to travel to a country unaffected by the Proclamations for an O-visa interview, *id.* at 5 (Affidavit of Hui Qi).

On December 4, 2020, plaintiffs moved for a preliminary injunction.  Plaintiffs make a number of overlapping APA claims, but at core they argue that the State Department's actions in implementing the Presidential Proclamations to suspend or refuse issuance of visas for O-visa applicants violates § 706(2) of the APA and that defendants' actions in delaying the processing of plaintiffs' visa applications violates § 706(1) of the APA.[2]  Plaintiffs request "an order from the Court requiring Defendants to immediately reinitiate processing of the named Plaintiffs,

---

[2]    Plaintiffs initially argued that other, unrelated presidential proclamations addressing the labor market and not referenced in their amended complaint were unlawful, Pls.' Mot. at 22–24, but abandoned that argument in their reply, Pls.' Reply Mem. Supp. Pls.' Mot. for Preliminary Injunction ("Pls.' Reply") at 1, ECF No. 12.  *See also* Defs.' Opp'n at 4 n.1 (explaining that "Plaintiffs do not plead any facts related to these two proclamations or plead facts that demonstrate any Plaintiff is subject to them").

including . . . scheduling and conducting interviews, adjudicating visa applications, issuing visas, and reissuing visas to those whose visas have expired."  Pls.' Reply at 19.

## II.   LEGAL STANDARD

A preliminary injunction "is a stopgap measure, generally limited as to time, and intended to maintain a status quo or 'to preserve the relative positions of the parties until a trial on the merits can be held.'"  *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  To obtain relief, the moving party must establish that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities" is in their "favor"; and (4) "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016).  The first factor is also the "most important factor."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *see also Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("[A] party seeking a preliminary injunction must demonstrate, among other things, 'a likelihood of success on the merits.'" (quoting *Gonzales v. O Centro Espirita Beneficente União do Vegetal*, 546 U.S. 418, 428 (2006))).[3]  A preliminary injunction "is an extraordinary . . . remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion" on each of the four factors.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis omitted)

---

[3]      The D.C. Circuit has previously followed a "sliding scale" approach to evaluating preliminary injunctions, but that approach is likely inconsistent with *Winter*, *see Archdiocese of Wash. v. Wash. Metro. Area. Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (observing that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned"); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295–96 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that "this Circuit's traditional sliding-scale approach to preliminary injunctions may be difficult to square with the Supreme Court's recent decisions in" *Winter* and *Munaf*), and therefore will not be employed here, *Singh v. Carter*, 185 F. Supp. 3d 11, 16–17 (D.D.C. 2016).

(quoting 11A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948, at 129–30 (2d ed. 1995)).

## III.   DISCUSSION

Plaintiffs' claims for relief fall into two categories.  First, they argue that the State Department's policy suspending the issuance of O visas to applicants in Proclamation-designated countries is unlawful because it is not in accordance with law, arbitrary and capricious, and in excess of statutory authority.  *See* 5 U.S.C. § 706(2)(A), (C).[4]  Second, plaintiffs argue that defendants have unreasonably delayed and unlawfully withheld adjudication of their visas.  *See id.* § 706(1).  After addressing threshold questions of justiciability, each merits argument is evaluated in turn before turning to the remaining preliminary injunction factors.

### A.     Threshold Issues

Defendants make two threshold arguments regarding the reviewability of agency action.  First, they argue that the doctrine of consular nonreviewability precludes three plaintiffs from challenging the refusals of their visa applications.  Second, defendants argue that all plaintiffs lack a cause of action under the APA to challenge the State Department's implementation of the Presidential Proclamations.

As to their first argument, defendants argue that the three plaintiffs whose visa applications have been denied, *see* Paterson Decl. ¶¶ 2–4, cannot demonstrate a likelihood of success on the merits because the doctrine of consular nonreviewability vests the ultimate authority to issue or refuse visa applications in the consular officer.  Defs.' Opp'n at 26–27.

---

[4]     Plaintiffs also argue that the policy is a substantive rule subject to the notice and comment requirements of 5 U.S.C. § 553.  Pls.' Mot. 28–31.  The likelihood of success on this issue will not be addressed here because a ruling in plaintiffs' favor would provide no additional relief.  Moreover, defendants have not identified any basis on which the Secretary could adopt a policy of suspending consideration of or categorically refusing to issue O-visas beyond the Presidential Proclamations, so this issue need not be reached if the Secretary's actions are not a reasonable interpretation of those Proclamations and thereby in accordance with law.  In other words, if the agency action is not in accordance with law, then the means by which it was implemented are irrelevant.

Since these applications have been denied, defendants argue, these plaintiffs lack standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Defendants note "the well-settled doctrine of consular non-reviewability recognizes that Congress has empowered consular officers with the exclusive authority to review proper applications for visas when made overseas." Defs.' Opp'n at 27 (emphasis omitted) (citing 8 U.S.C. §§ 1104(a), 1201(a), (g), and *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1156 (D.C. Cir. 1999)). "This circuit has recognized, as has every circuit to consider the issue, that the courts are without authority to displace the consular function in the issuance of visas." *Saavedra Bruno*, 197 F.3d at 1164 (quoting *City of New York v. Baker*, 878 F.2d 507 (D.C. Cir. 1989)). Defendants argue that this doctrine applies here to the three plaintiffs whose visas have been refused.

Plaintiffs respond that the doctrine does not apply—and thus judicial review is available—where plaintiffs challenge the State Department's policies rather than the individual determination of a consular officer. Pls.' Reply at 11. The Court agrees. The D.C. Circuit has held that the consular non-reviewability does not apply where plaintiffs "do not challenge a particular determination in a particular case of matters which Congress has left to executive discretion" but instead improperly promulgate rules in violation of statute. *Int'l Union of Bricklayers & Allied Craftsmen v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985). This precedent has been applied in this district to allow challenges to the legality of State Department policies— and their application—without implicating the discretionary decisionmaking of individual consular officers. *P.K. v. Tillerson*, 302 F. Supp. 3d 1, 12 (D.D.C. 2017) ("[T]he doctrine of consular non-reviewability does not apply because Plaintiffs challenge the State Department's policy, not the discretion of a specific consular officer in applying the policy."). This reasoning applies with full force here, where defendants themselves confirm that the three plaintiffs were

refused visas specifically because they fell under the relevant Presidential Proclamations, Paterson Decl. ¶¶ 2–4, and agency policy required visas to be refused under such circumstances.

Second, defendants argue that executive agency actions taken "to implement a Presidential proclamation, pursuant to discretionary authority that was committed to the President, are unreviewable under the APA."  Defs.' Opp'n at 32; *see also Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992) (presidential actions "not subject to [the APA's] requirements").  This attempt to bootstrap the nonreviewability of presidential actions to discretionary authority delegated to the State Department does not have support in precedent. The D.C. Circuit has expressed doubt that regulations promulgated by an executive agency to "flesh out" an executive order would be unreviewable simply because they are based on an executive order.  *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996); *see also Public Citizen v. U.S. Trade Rep.*, 5 F.3d 549, 552 (D.C. Cir. 1993) ("*Franklin* is limited to those cases in which the President has final constitutional or statutory responsibility for the final step necessary for the agency action directly to affect the parties."); *Gomez v. Trump*, Civil Action No. 20–1419 (APM), 2020 WL 5367010, at *16 (D.D.C. Sept. 4, 2020) ("To the extent Defendants contend that the court is foreclosed from reviewing agency actions taken to implement Proclamations, they are wrong."  (Emphasis omitted)).

Defendants rely only on *Detroit International Bridge Co. v. Government of Canada*, 189 F. Supp. 3d 85 (D.D.C. 2016), *aff'd on other grounds*, 875 F.3d 1132 (D.C. Cir. 2017) (subsequent history omitted), to support their position.  Defs.' Opp'n at 32–33.  In that case, the district court determined that the State Department's issuance of a bridge permit was unreviewable under the APA.  *Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 100–02.  That case is readily distinguishable and articulates a much more modest position than what defendants

propose here.  In *Detroit International Bridge, Co.*, "Congress had delegated to the President power over final approvals of such bridges, the President approved the bridge, and State's actions were mere 'ministerial implementation of presidential action.'"  *Milligan v. Pompeo*, Civil Action No. 20–2631 (JEB), 2020 WL 6799156, at *6 (D.D.C. Nov. 19, 2020) (quoting *Gomez*, 2020 WL 5367010, at *16); *see also Detroit Int'l Bridge Co.*, 189 F. Supp. 3d at 100–02.

Here, plaintiffs do not allege that the State Department's actions are ministerial, but rather that those actions expanded the scope of the Presidential Proclamations by adding a restriction on the issuance of visas to the Proclamations' restriction on entry.  The Proclamations provide that "[t]he Secretary of State shall implement this proclamation as it applies to visas pursuant to such procedures as the Secretary of State, in consultation with the Secretary of Homeland Security, may establish."  *E.g.*, Proclamation No. 9984, 85 Fed. Reg. at 6711 (Section 3).  The means by which the Secretary implements the Proclamations are therefore within the discretion of the Secretary, are not dictated by the Proclamations themselves, and require the Secretary to exercise judgment.  Defendants may argue that they are required to implement the Proclamation in a certain way, Defs.' Opp'n at 34, but this is just a restatement of the merits argument, and defendants cannot rely on a disputed interpretation of the statute to evade judicial review of the agency's implementation of the Proclamations.[5]

---

[5]     In a related argument, defendants argue that plaintiffs' claims are barred from judicial review because "[p]laintiffs seek judicial review of executive branch exercise of power clearly provided by Congress."  Defs.' Opp'n at 29 (citing *Fiallo v. Bell*, 430 U.S. 787, 796 (1977)).  Plaintiffs do not seek judicial review of an act of Congress (as in *Fiallo*) or of the President's exercise of a power granted by Congress, but instead challenge State Department policy that they claim is at odds with a statute.  Such a claim is not immune from judicial review.

**B.      Likelihood of Success on the Merits**

      **1.      *O-Visa Suspension and 8 U.S.C. § 1182(f)***

Plaintiffs challenge the State Department's reliance on the Presidential Proclamations and 8 U.S.C. § 1182(f) to suspend O-visa processing in countries affected by the Presidential Proclamations.  Framing this argument in various ways, plaintiffs argue that the action is not in accordance with law, in excess of statutory authority, and arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(C); *id.* § 706(2)(A); *see also* Pls.' Mot. at 25–27, 31–32.  Whichever way the argument is framed, the essential issue is the same: Is the State Department's suspension of O-visa processing on the basis of the Presidential Proclamations lawful?

Plaintiffs argue that 8 U.S.C. § 1182(f) does not permit the State Department to categorically suspend *visa adjudications* or require consular officers to refuse visa applications on the basis of the Presidential Proclamations that only affect the criteria for *entry*.  Section 1182(f), which provides the basis for the Presidential Proclamations, states that:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants . . . .

8 U.S.C. § 1182(f).  Plaintiffs argue that the State Department acted in excess of authority when it directed consular officers to suspend issuance of O visas on the basis of the Presidential Proclamations and § 1182(f), which apply only to "entry."  Pls.' Mot. at 26–27; Pls.' Reply 3–6; *see also* July 8 DOS Guidance ¶¶ 10–11.  While "[a] person may be restricted from entering the country, . . . that does not mean they are inadmissible to the United States and therefore ineligible to receive a visa."  Pls.' Reply at 6.  Plaintiffs point out that they could, if issued visas in countries covered by the Proclamations, quarantine in a non-affected country for 14 days before attempting entry into the United States or wait until the entry suspensions expired.  Pls.'

Mot. at 8–9, 31–32.  Pointing to the fact that "a consular officer may issue" visas to individuals who have "made proper application therefor," 8 U.S.C. § 1201(a)(1), and that the INA expressly denies the Secretary of State "those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas," 8 U.S.C. § 1104(a), plaintiffs argue that the State Department's guidance categorically suspending visa issuance on the basis of the Proclamations' entry restriction is not compelled by § 1182(f) and is, in fact, unlawful.  Pls.' Mot. at 25–27.

This position has been adopted, in thoroughly reasoned decisions, by two other Judges in this District, who have granted preliminary injunctions stemming from similar challenges to the State Department's interpretation of § 1182(f) to preclude the issuing of visas to other categories of visa applicants.  *Milligan*, 2020 WL 6799156, at *7; *Gomez*, 2020 WL 5367010, at *27–28.

Defendants respond that "[c]onsular officers are *required* to refuse visas to persons subject to a Presidential Proclamation imposing entry restrictions pursuant to § 1182(f) unless the applicant is found eligible for an exception or waiver," so the State Department's policy of suspending visa issuance is required by law to implement the Presidential Proclamations.  Defs.' Opp'n at 13–14 (emphasis added).  This argument is predicated on 8 U.S.C. § 1201(g), which provides that "[n]o visa . . . shall be issued to an alien if . . . it appears to the consular officer . . . that such alien is ineligible to receive a visa or other such documentation under section 1182."  Defendants argue that individuals who are subject to an entry restriction under Presidential Proclamation made pursuant to § 1182(f) are "ineligible to receive a visa" under the terms of § 1201(g).  Defs.' Opp'n at 14–15.  This argument relies on § 1182(a), which provides: "Except as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas *and* ineligible to be admitted to the United States."

14

8 U.S.C. § 1182(a) (emphasis added).  Defendants reason that § 1182(f) is included as a "paragraph" within the terms of § 1182(a), that the suspension of the "entry" of a group of aliens under § 1182(f) renders those aliens "inadmissible," and they are therefore ineligible to receive visas under § 1201(g).  Defs.' Opp'n at 14.

This reading is contrary to the text and structure of § 1182.  The consequences of ineligibility described in § 1182(a) are irrelevant to the interpretation of § 1182(f) because the latter is not a "paragraph" of the former but rather an entirely separate subsection.  Section 1182(a) applies to specific "classes of aliens" described in ten paragraphs within that subsection. Its application begins and ends there, and the provision does not render inadmissible classes of aliens described elsewhere in the statute.  *See* Pls.' Reply at 2–4.  As Judge Mehta concluded in *Gomez*, "[s]ection 1182 of the INA carefully distinguishes between subsections, which include §§ 1182(a) and 1182(f), and paragraphs, which are subunits of those subsections," so § 1182(a)'s use of "the following paragraphs," references "only the ten paragraphs of § 1182(a)."  2020 WL 5367010, at *27.  Because § 1182(f) concerns itself only with entry, a person subject to a Presidential Proclamation relying on § 1182(f) is only ineligible to enter, but not ineligible for a visa.  *Id.*  "Subsection 1201(g) precludes the issuance of visas only as to person who are 'ineligible to receive a visa' under Section 1182, not to persons who are only ineligible to enter under that provision."  *Id.* (emphasis omitted).  In *Milligan*, Judge Boasberg adopted this analysis of § 1182(f) with respect to a different group of visa applicants.  2020 WL 6799156, at *6.  The Court finds the analysis persuasive and adopts it here.

Defendants further suggest that plaintiffs' interpretation of § 1182(f) would put it in conflict with two other statutory provisions.  First, they point to 8 U.S.C. § 1185(a)(1), which "makes it unlawful for an alien to enter or attempt to enter the United States in violation of rules,

regulations and orders prescribed by the President."  Defs.' Opp'n at 19 (emphasis omitted).

Defendants argue that a consular officer who issues a visa to an alien subject to one of the

Presidential Proclamations would be violating a presidential order and § 1185(a)(1) by

authorizing the alien to attempt an unlawful entry.  This is not so.

A visa recipient subject to one of the Presidential Proclamations would violate § 1185(a)

by *immediately* attempting entry but would not be subject to the entry restriction if she (1)

quarantined in a non-affected country before attempting entry or (2) waited until the

Proclamation expired before attempting entry.  After all, "[o]btaining a visa from an American

consul has never guaranteed an alien's entry into the United States[, but instead] merely gives the

alien permission to arrive at a port of entry and have an immigration officer independently

examine the alien's eligibility for admission."  *Saavedra Bruno*, 197 F.3d at 1157 (citing

8 U.S.C. § 1201(h)); *see also* 8 U.S.C. § 1185(d) ("Nothing in this section shall be construed to

entitle an alien to whom a permit to enter the United States has been issued to enter the United

States, if, upon arrival in the United States, he is found to be inadmissible under any of the

provisions of this chapter, or any other law . . . .").  Ensuring compliance with a Presidential

Proclamation could just as easily be done at the time of attempted entry as at the time of visa

issuance and, indeed, would more precisely implement the entry restrictions of the Presidential

Proclamations since individuals unable lawfully to enter the United States under § 1182(f) at the

time of visa issuance may be able legally to enter just two weeks later.

Second, defendants point to a statute requiring consular officers to certify when issuing a

visa "that a check of the Automated Visa Lookout System, or any other system or list which

maintains information about the excludability of aliens under the [INA] has been made and that

there is no basis under such system for the exclusion of such alien."  Defs.' Opp'n at 15 n.6

(alteration in original) (quoting Foreign Relations Authorization Act, Years 1994 and 1995, Pub. L. No. 103–236, § 140(c)(1)(A) (note to 8 U.S.C. § 1182)).  This, defendants argue, supports their argument that individuals who are ineligible for "entry" under § 1182(f) may not be granted visas.  Accepting this argument would require the conclusion that "exclusion" within the meaning of the statute encompasses ineligibility for entry as contemplated by § 1182(f).  Defendants do not explain, however, how the term "excludability" relates to "inadmissibility," under § 1182(a), or "entry," under § 1182(f).  Nor do they explain whether the "system[s] or list[s] which maintains information about the excludability of aliens" would include information about individuals subject to § 1182(f).  In the absence of such information, the Court cannot conclude that this provision is inconsistent, or even in tension, with plaintiffs' interpretation of § 1182(f).

Putting aside the statute, defendants next point to the State Department's historical practice of refusing visas to applicants subject to a presidential proclamation barring entry. Defs.' Opp'n at 15–19.  According to defendants, the State Department's Foreign Affairs Manual explicitly lists coverage under a presidential proclamation pursuant to § 1182(f) as a "ground[] for refusal."  9 FAM 301.4-1(a).  Defendants also cite instances where the State Department has implemented presidential proclamations limiting the entry of certain aliens by suspending the issuance of visas.  *See*, *e.g.*, 9 FAM 301.14-10(B)(1), (2) (identifying nationals subject to Proclamation 9645, 82 Fed. Reg. 45161 (Sept. 24, 2017), and Proclamation 9983, 85 Fed. Reg. 6699 (Jan. 31, 2020), for whom "issuance of visas . . . is suspended.").  Past visa statistics confirm that "consular officers have regularly refused immigrant and nonimmigrant visa applications pursuant to entry restrictions under § 1182(f)" in the years before the Presidential Proclamations at issue here.  Defs.' Opp'n at 17–18 (citing U.S. Dep't of State, Bureau of

Consular Affairs, *Annual Reports, Report of the Visa Office 2004–2016*,

http://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics/annual-reports.html (last

visited Jan. 15, 2021).  No matter how firmly entrenched, however, past practice cannot provide

a justification for agency action clearly contrary to statute.  *See Milligan*, 2020 WL 6799156, at

*7.

Defendants next contend that *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), and various cases

within this district, support the proposition that aliens subject to an entry restriction under

§ 1182(f) are ineligible for visas.  Defs.' Opp'n at 14, 18 & n.7.  None of these cases, however,

directly addresses the relationship between "entry" under § 1182(f) and visa eligibility.  As

plaintiffs point out, *Trump v. Hawaii* "made no broad announcement that a proclamation

suspending *entry* under § 1182(f) equates to a suspension of *visa issuance* generally," and that

case involved a challenge to the proclamation itself rather than the implementation of a

proclamation.  Pls.' Reply at 5–6 (emphasis in original).

Defendants have identified no applicable statutory authority permitting the State

Department to suspend visa processing on the basis of the entry restrictions provided by the

Presidential Proclamations.  Persons subject to the Presidential Proclamations are not ineligible

to receive visas under §§ 1182(f) and 1201(g), so plaintiffs are likely to succeed on the merits in

their claim that the suspension and refusal of O visa processing is "not in accordance with law"

and "in excess of statutory . . . authority."  5 U.S.C. § 706(2)(A), (C).

### C.  Unreasonable Delay

Plaintiffs also bring an unreasonable delay claim under § 706(1) that applies both to the

plaintiffs covered by the Proclamations, Am. Compl. ¶¶ 21–34, 36, and the one plaintiff located

outside the Proclamation-designated countries, *id.* ¶¶ 35.  They contend that "the Department of

State has failed to adjudicate and issue O visas for the plaintiffs within a reasonable time," so the

18

"Court should order the Department of State to resume issuing and reissuing O visas to Plaintiffs . . . ."  Pls.' Mot. at 26.  While this unreasonable delay claim applies to those plaintiffs affected by the Proclamations, the more accurate issue for them is not that the processing has been *delayed*, but rather than the government has imposed a policy of refusing to issue their visas pursuant to the government's interpretation of § 1182(f).  This goes to the question of remedy, that is, whether the government should be ordered merely to comply with the law or immediately to adjudicate plaintiffs' visas.  This is suggested in plaintiffs' motion, which barely mentions § 706(1), unreasonable delay, or unlawfully withheld agency except to say that "this court has authority to compel this unlawfully withheld action."  Pls.' Mot. at 30 (citing 5 U.S.C. § 706(1)).[6]

The APA requires agencies to "proceed to conclude a matter presented to [them]" in a "reasonable time," 5 U.S.C. § 555(b), and authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1).  "In the context of a claim of unreasonable delay," the Court must consider whether the agency's failure to respond is "so egregious" as to warrant relief. *See Telecomms. Rsch. & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 79 (D.C. Cir. 1984).  In determining whether a delay in agency action is unreasonable, the D.C. Circuit has enumerated six factors to be considered:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare

---

[6]    Defendants argue that plaintiffs' claim of unlawful withheld agency action under § 706(1) must fail with respect to plaintiffs subject to the Presidential Proclamations because "consular officers are required by law to refuse visas for applicants subject to entry restrictions issued under 8 U.S.C. § 1182(f)," and thus the State Department has not "unlawfully withheld" a final agency action within the meaning of 5 U.S.C. § 706(1).  Defs.' Opp'n at 23.  As detailed above, *see supra* Part III.B, the Court disagrees.  Plaintiffs have not, however, provided any legal standard or argument distinguishing between visa adjudications being "unlawfully withheld" as opposed to "unreasonably delayed" under § 706(1).  The analysis of plaintiffs' claim that agency action was unlawfully delayed therefore addresses the entirety of plaintiffs' § 706(1) claims to compel agency action.

are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80 (internal quotations and citations omitted). The first factor is the most important. *See In re Core Commc'ns Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004); *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016).[7]

The first and second *TRAC* factors are considered together and are neutral. Defendants state that there is "no statutory or regulatory timetable governing the issuance of O visas," Defs.' Opp'n at 24, and plaintiffs do not suggest otherwise. "Absent a congressionally supplied yardstick, courts typically turn to case law as a guide," *Sarlak v. Pompeo*, Civil Action No. 20–35 (BAH), 2020 WL 3082018, at *6 (D.D.C. June 10, 2020), and "Congress has given [the State Department and other agencies] wide discretion in the area of immigration processing." *Skalka v. Kelly*, 246 F. Supp. 3d 147, 153–54 (D.D.C. 2017). "There is 'no per se rule as to how long is too long' to wait for agency action,'" *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (quoting *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149 (D.C. Cir. 1992)). Whether a "rule of reason" exists for agency action "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003).

---

[7]     This standard applies to both a mandamus petition and a claim of unreasonable delay under the APA. Plaintiffs' amended complaint lists unreasonable delay claims under both the Mandamus Act, 28 U.S.C. § 1361, Am. Compl. ¶¶ 66–68, and the APA, 5 U.S.C. §§ 555(b), 706(1), Am. Compl. ¶¶ 87–92. Their motion for a preliminary injunction, however, only addresses the claim under the APA. Pls.' Mot. at 24–26.

Plaintiffs have been collectively waiting ten months for visa adjudication since U.S. Embassies and Consulates initially shut down in March 2020, though some have been waiting somewhat longer and some have been waiting less.  Notably, plaintiffs do not argue that the *length* of the delay is necessarily unreasonable.  Instead, they complain that the O visa adjudication has been "deprioritized" relative to the issuance of other visa categories—including those exempt from the Presidential Proclamations and/or deemed "mission critical" or "emergency"—and subject to low interview priority even in those countries unaffected by the Presidential Proclamations that have not yet resumed regular visa services, per instructions provided in State Department cables.  Pls.' Reply at 8; Pls.' Mot. at 19; *see also* July 8, 2020 DOS Guidance ¶¶ 10–11; Marwaha Decl. ¶ 10.[8]

Defendants explain that the delay in processing plaintiffs' visa applications is a function of "the Secretary of State's decision to reduce consular processing [in order to] protect the health of consular officers and the public" in light of the COVID-19 pandemic.  Defs.' Opp'n at 24

---

[8]    Plaintiffs make overlapping claims that the State Department has not justified its "various prioritizations" of other visa applicants over O-visa applicants in the phased resumption of visa services, Pls.' Mot. at 27, and suggest that defendants' decisions to exclude O-visa applicants from the list of "mission critical" functions and deny O-visa applicants a categorial national interest exception were arbitrary and capricious and should be set aside, *id.* at 19; *see* 5 U.S.C. § 706(2)(A).  As a threshold matter, the record does not make clear whether these determinations are affecting the adjudication of plaintiffs' visas independent of the implementation of the Proclamations.  Furthermore, defendants counter that the Secretary of State's authority to direct the Department and the U.S. Foreign Service in the midst of a global pandemic is authorized under 22 U.S.C. § 2651a, which provides broad discretion to determine the allocation of scarce resources in a time of crisis.  Defs.' Opp'n at 12; *see also* 22 U.S.C. § 2651(a)(3)(A) ("The Secretary shall administer, coordinate, and direct the Foreign Service of the United States and the personnel of the Department of State, except where authority is inherent in or vested in the President.").  In challenging defendants' prioritization, plaintiffs suggest no standard to employ in reviewing and forcing the State Department to give them priority or even how to evaluate internal and purely discretionary State Department actions ordering its priorities and allocating scarce resources in pandemic.  As plaintiffs themselves note, "the Proclamations do not specify the standards for determining when an alien's entry would be in the national interest." Pls.' Mot. at 20.  Nor have plaintiffs identified a final agency action that they wish to challenge.  *See* 5 U.S.C. §§ 551, 704.  Moreover, the determination and prioritization of "mission critical" functions during a time of crisis and administrative triage lies squarely within the discretion of the Secretary of State, under 22 U.S.C. § 2651a, and is not subject to judicial review.  *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (judicial review unavailable where the Court "would have no meaningful standard against which to judge the agency's exercise of discretion"); *see also* 5 U.S.C. § 701(a)(2) (judicial review unavailable where "agency action is committed to agency discretion by law").  Plaintiffs' challenges to the prioritization of visa processing, rather than the refusal to adjudicate or issue O visas, are therefore best viewed through the lens of unreasonable delay.

(citing Marwaha Decl. ¶¶ 2, 7).[9]  Further, they indicate that "the Secretary of State must be permitted to address this immense backlog of applicants, balancing the health and welfare of consular resources."  Defs.' Opp'n at 25.  Nowhere, however, do defendants provide specific reasons why that balancing appears to deprioritize O-visa applicants, other than reliance on the Proclamations.

Plaintiffs raise valid concerns about the reasonableness of the rules governing the State Department's actions, which largely overlap with their first merits claim.  Certainly, for the reasons set out, *supra*, in Part III. B., the State Department's suspension of O visa issuance on the basis of the Presidential Proclamations is not "reasonable" or lawful, and is addressed by relief on plaintiffs' § 706(2) claim.  Plaintiffs' concern about visa prioritization (*i.e.*, exclusion from the list of "mission critical" functions) is a separate issue, as to which defendants note that the number of O visas adjudicated has been steadily rising since consular operations started to resume.  Grewe Decl. ¶ 5.  For the single plaintiff who appears to be unaffected by the Presidential Proclamations, *see* Am. Compl. ¶ 35, and who has been waiting seven months for her visa to be adjudicated, plaintiffs present no facts indicating that the State Department's prioritization has caused the relevant delay.  Further, neither the complaint nor plaintiffs' briefing provides any information about the status of visa processing in the relevant country (Australia).

Plaintiffs' wholesale reliance on agency prioritization in arguing that agency decisionmaking lacks a "rule of reason" creates tension with the fourth *TRAC* factor, which looks to "the effect of expediting delayed action on agency activities of a higher or competing priority."  *TRAC*, 750 F.2d at 80.  This factor often carries significant weight, *see Mashpee*

---

[9]    Plaintiffs suggest that reduced visa processing is an issue "even in countries where COVID-19 is actually not a factor in daily life," but provide no support for this proposition.  Pls.' Reply at 8.

*Wampanoag Tribal Council, Inc.,* 336 F.3d at 1100, and conclusively favors defendants' position here.  Relief that would simply "reorder" a queue of applicants seeking adjudication is generally viewed as inappropriate when "no net gain" in such adjudications is achieved.  *Sarlak*, 2020 WL 3082018, at *6 (quoting *In re Barr Labs., Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991)); *see also Bagherian v. Pompeo*, 442 F. Supp. 3d 87, 95–96 (D.D.C. 2020) (same); *Didban v. Pompeo*, 435 F. Supp. 3d 168, 176 (D.D.C. 2020) (finding that reordering waiver applications "would impermissibly interfere with the agency's 'unique' and 'authoritative [ ] position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way'" (quoting *In re Barr Labs., Inc.*, 930 F.2d at 76)); *Ghadami v. U.S. Dep't of Homeland Sec.*, Civil Action No. 19–397 (ABJ), 2020 WL 1308376, at *9 (D.D.C. Mar. 19, 2020) (finding that expediting action "would merely direct government resources from the adjudication of other waiver applications"); *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 117 (D.D.C. 2005) ("[W]here resource allocation is the source of the delay, courts have declined to expedite action because of the impact on competing priorities.").

Defendants face an extraordinary backlog of visas across the world, Defs.' Opp'n at 25, processing visas at less than 11 percent of normal capacity from July 15, 2020 to September 30, 2020, Grewe Decl. ¶ 3, and processing nonimmigrant visa applications at less than 16 percent of normal capacity in November 2020, *id.* ¶ 4.  Given this backlog and the continued suspension of routine operations around the world due to the pandemic, defendants correctly posit that deference to the State Department's priority-setting and prioritization of "mission critical" functions is necessary.  Defs.' Opp'n at 25.  Plaintiffs respond that because their number is small, expeditiously processing their applications "would not displace other competing priorities."  Pls.' Reply at 9.  By this logic, however, any individual plaintiff or small group of plaintiffs could

prevail on this factor by pointing to their small number.  While the effect of an individual case would be minimal, an accumulation of such individual cases being pushed by judicial fiat to the front of the line would erode the ability of agencies to determine their priorities.  This factor heavily favors defendants' position.

The third and fifth factors consider whether "human health and welfare are at stake" and the "nature and extent of the interests prejudiced by delay."  *TRAC*, 750 F.2d at 80.  Plaintiffs have been separated from friends, family, and loved ones, which has taken an emotional toll. *E.g.,* Notice of Errata, Ex. 1 at 7 (Affidavit of Colin O'Riordan); *id.* at 5 (Affidavit of Hui Qi). The delays in some cases endanger plaintiffs' careers and livelihoods.  *E.g.*, *id.* at 2 (Affidavit of Wenli Yan).  Defendants do not argue otherwise but emphasize that the policies plaintiffs challenge have been taken to protect "the health and welfare of U.S. mission staff and the public."  Defs.' Opp'n at 25.  This point is well-taken, but the nature of plaintiffs' interests and the prejudice to those interests from delay in processing their visas, still weigh in their favor.

The sixth and final factor weighs in defendants' favor.  "[T]he court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"  *TRAC*, 750 F.2d at 80.  Here, however, "the good faith of the agency in addressing the delay weighs against" relief.  *See Liberty Fund, Inc.*, 394 F. Supp. 2d at 120 (citing *In Re Am. Fed'n of Gov't Employees*, 837 F.2d 503, 507 (D.C. Cir. 1988)).  Plaintiffs are frustrated that defendants have continued to employ policies that courts have enjoined as to other plaintiffs, but do not allege any impropriety.

The Court sympathizes with plaintiffs concerns—the delays in visa processing are keeping them from pursing their careers and, in some cases, reuniting with family.  Many other individuals are in similarly trying circumstances, however, and defendants face challenges in

determining how to best deploy scarce resources.  Balancing the relevant factors, "the government's interests in balancing its own priorities" and determining how to allocate scarce resources in a global pandemic outweigh plaintiffs' interests in immediate adjudication of their visas.  *See Milligan*, 2020 WL 6799156, *10 (quoting *Bagherian*, 2020 WL 674778, at *6).

### D.     Remaining Preliminary Injunction Factors

A party seeking a preliminary injunction must show both irreparable harm and that the balance of the equities, including the public interest, favors relief.  These factors are examined below with respect to plaintiffs' § 1182(f) claim on which they have shown a likelihood of success on the merits.

### 1.     *Irreparable Harm*

A party seeking a preliminary injunction must show that its injury is "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation marks and emphasis omitted) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  The injury must also be "both certain and great," and be "beyond remediation." *Id.*

Plaintiffs argue that they "will no longer be able to pursue a nonimmigrant visa or entry into the United States without an immediate injunction."  Pls.' Mot. at 33.  Furthermore, they contend that defendants' implementation of the Proclamations has led to "economic frustration, certain job loss, and separation of families." *Id.*  Some plaintiffs have been unable to start or continue working at jobs in the United States. *E.g.*, Affidavit of Wenli Yan; Pls.' Mot, Ex. A at 20 (Affidavit of Zoe Hutton), ECF No. 8-1.  Others have been separated from family and loved ones. *E.g.*, Affidavit of Hui Qi.  Still others have experienced *both* personal harms and professional risks that threaten their employment and livelihood.  Pl.'s Mot., Ex. A at 13 (Affidavit of Arsha Nagrani).  Separation from family and the kind of severe, unrecoverable

monetary losses plaintiffs allege are enough to constitute irreparable harm.  *Leiva-Perez v. Holder*, 640 F.3d 962, 969–70 (9th Cir. 2011) (family separation); *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 52–53 (D.D.C. 2011) (unrecoverable and great economic harm).

Defendants contest plaintiffs' irreparable harm showing on several grounds, none of which has merit.  First, defendants point out that the Secretary of State's determination to suspend the adjudication of their O-visa applications or a consular officer's refusal because they are inadmissible under § 1182(f) does not affect their future eligibility to seek an O visa.  Defs.' Opp'n at 35.  This is irrelevant.  Plaintiffs may be able to pursue a visa, but as long as the unlawful policy is in effect, they will not be granted a visa, which is the salient outcome, and that harm will persist as long as the policy remains in place.

Second, defendants argue that plaintiffs' separation from their families is not a cognizable harm because statutory limits on other visa categories create a backlog and prolong separation between other visa applicants and their families.  Defs.' Opp'n at 35–36.  The fact that other people entirely unrelated to this suit face similar harms because of a statutory provision unrelated to this action is irrelevant, since the focus is on whether plaintiffs are being harmed by an unlawful State Department policy.

Third, defendants argue that plaintiffs have not shown that their alleged harm is "both certain and great" by not providing "evidence that a consular officer will make a positive determination for each and every Plaintiff regarding the merits of their visa application."  Defs.' Opp'n at 36 & n.10.  At the same time, defendants suggest no reason that adjudication of plaintiffs' visa applications would fail to result in issuance of the visas, particularly since plaintiffs' initial petitions with USCIS have already been approved.

Lastly, defendants argue that because the Constitution does not guarantee foreign nationals the right to reside with their families, separation from their families cannot constitute irreparable harm.  Defs.' Opp'n at 36.  This argument is also unconvincing.  Plaintiffs' harm need not correspond to a constitutional entitlement to be cognizable in the irreparable harm analysis, and "separation from family members" is an "important irreparable harm factor[]." *Milligan*, 2020 WL 6799156, *11 (alteration in original) (quoting *Leiva-Perez*, 640 F.3d at 969–70).

In sum, defendants present no serious reason to doubt the irreparable harms plaintiffs allege.

### 2.    *Balance of the Equities and Public Interest*

In determining whether to grant a preliminary injunction "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (internal quotation marks omitted) (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).  "In exercising their sound discretion, courts . . . should [also] pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Id.* (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)).  In cases where the government is the non-movant, these factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Defendants hypothesize that various "practical problems" would result if consular officers were required to issue visas to plaintiffs with an "annotation" "indicating that the alien is barred from admission" if entry is attempted without complying with the conditions of the Presidential Proclamations.  Defs.' Opp'n at 37.  In defendants view, granting plaintiffs' motion would effectively make compliance with the Proclamations impossible, stating:

> [T]here would no longer be any means by which the U.S. government could monitor
> whether the now-visa holder complies with the conditions of the Proclamation; it would
> be left to the airlines to determine when the applicant seeks to board whether the
> applicant has complied with the 14-day quarantine requirement or, as a last resort, to the
> Department of Homeland Security and Customs and Border Protection at the border, who
> may have to turn the alien around if they determine that they remain inadmissible under
> the Proclamations.

*Id.* at 37–38.[10]

These alleged practical problems are not as significant as defendants allege. Independent inspection of aliens at the point of entry in the United States is an integral part of the immigration system. The Supreme Court contemplated just this situation in *Trump v. Hawaii*, noting that even when a "consular officer issues a visa," that "visa does not entitle an alien to enter the United States 'if, upon arrival,' an immigration officer determines that the applicant is 'inadmissible under [the INA], or any other provision of law'—including § 1182(f)." 138 S. Ct. at 2414 (quoting 8 U.S.C. § 1201(h)). The system contemplates this point of inspection to ensure that those who are not permitted to enter the country are, in fact, refused entry. Plaintiffs also point out that the Department of Homeland Security has permitted travelers under the Visa Waiver Program—which allows foreign nationals to enter United States without a visa—so long as they "have not been in [a Proclamation country] during the 14-day period preceding entry" and "are not departing from or transiting through [a Proclamation Country]," stating that if those conditions are met "then [they] are not subject to the Proclamation." Pls.' Reply at 18 (citing Am. Compl., Ex. 22, ECF No. 7-22). Plaintiffs argue that the U.S. Government is well able to ensure that foreign nationals traveling on O visas have not been in an area covered by any of the

---

[10]     Defendants also assert that confusion would result among visa applicants, who might not understand that having a visa would not permit entry if they were covered by a Proclamation or that their visas could expire before they were authorized to enter the United States. *Id.* These last two concerns are negligible given that the request for injunctive relief is limited to the eighteen plaintiffs, whose participation in this case would obviate such confusion. *See* Pls.' Reply at 19.

Proclamations within the 14 days prior to boarding a flight to the United States. *Id.* They also acknowledge that they would have to quarantine after their visas are issued before they can travel to the United States and represent that they fully intend to comply with the Proclamations. *Id.* at 16.

The risk of illegal entry hypothesized by defendants is therefore negligible and cannot outweigh plaintiffs' interest—and the public interest—in being reunited with their families and avoiding serious economic hardship. *See Leiva-Perez*, 640 F.3d 962 at 969–70 (citing *Andreiu v. Ashcroft*, 253 F.3d 477, 484 (9th Cir. 2001) (en banc))  More fundamentally, there is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations" and "generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (internal quotation marks and citation omitted).  The balance of the equities and public interest weigh in favor of plaintiffs.

### E.     Relief

Plaintiffs request "an order from the Court requiring Defendants to immediately reinitiate processing of the named Plaintiffs, . . . scheduling and conducting interviews, adjudicating visa applications, issuing visas, and reissuing visas to those whose visas have expired."  Pls.' Reply at 19.  Defendants argue that the Court should instead only require "periodic update[s] on the status of Plaintiffs' visa processing," Defs.' Opp'n at 38–39, stating that such relief is consistent with the relief offered in this Circuit under similar circumstances, *id.* at 40–41 (citing *Cobell v. Norton*, 240 F.3d 1081, 1108–09 (D.C. Cir. 2001)).  In *Cobell*, the D.C. Circuit affirmed a district court order requiring the defendant agencies to "come into compliance with their duties" in further proceedings, combined with periodic status reports to facilitate judicial monitoring. 240 F.3d at 1094.  That must be part of the injunctive relief here, too, because the State

Department has acted outside its statutory authority and contrary to law in refusing to issue O visas to applicants covered by the Presidential Proclamations.

The Court will not, however, grant the entirety of the injunctive requested by plaintiffs, such as requiring defendants to "immediately reinitiate processing" of plaintiffs' visa applications and taking various specific actions to that end.  Plaintiffs have demonstrated a likelihood of success on the merits in establishing that the State Department's outright refusal issue O visas to applicants in Proclamation countries is not in accordance with law, and the scope of the injunction is limited to remedying that injury.

## IV.     CONCLUSION

Plaintiffs have shown that a preliminary injunction is warranted on their claim that defendants' implementation of the Presidential Proclamations under § 1182(f) to suspend issuance of O visas in Proclamation-designated countries violates the APA, and the State Department is enjoined from relying on the Presidential Proclamations to suspend or refuse visa adjudications for those plaintiffs covered by the Proclamations.  Defendants will be directed to provide monthly updates, with detailed information from knowledgeable personnel, on the status of plaintiffs' O-1 and O-3 visa applications throughout the pendency of this case until resolved.

The Court will issue contemporaneously with this Memorandum Opinion an Order granting in part and denying in part plaintiffs' Motion for a Preliminary Injunction.

Date: January 16, 2021

_____
BERYL A. HOWELL
Chief Judge